# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

PAUL M. NIGL and SANDRA
JOHNSTON,

                    Plaintiffs,

  v.

JON LITSCHER, MICHAEL
MEISNER, SARA HUNGERFORD,
and ZACHARY SCHROEDER,

                    Defendants.

Case No. 17-CV-925-JPS

**ORDER**

## 1.     INTRODUCTION

Plaintiffs Paul M. Nigl ("Nigl"), a prisoner, and Sandra Johnston ("Johnston"), his fiancée, filed a *pro se* complaint under 42 U.S.C. § 1983, alleging their civil rights were violated. (Docket #1). Specifically, the Plaintiffs allege that the Defendants, officers of the prison where Nigl was previously housed and the Wisconsin Department of Corrections secretary, violated Plaintiffs' Fourteenth Amendment right to form an intimate relationship by not allowing them to marry. Plaintiffs also allege a violation of their Fourteenth Amendment right to equal protection because Defendants have denied them visitation privileges but have, according to Plaintiffs, permitted visitation for similarly-situated persons.

The parties have filed cross-motions for summary judgment. (Plaintiffs' Motion, Docket #46; Defendants' Motion, Docket #51). Those motions are now fully briefed and ripe for adjudication. *See* (Docket #46–#59, #65–#68, #72–#75). For the reasons explained below, Defendants'

motion will be granted, Plaintiffs' motion will be denied as moot, and this case will be dismissed.

**2.      STANDARD OF REVIEW**

Federal Rule of Civil Procedure 56 provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The court construes all facts and reasonable inferences in the light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016).

**3.      RELEVANT FACTS**

The following facts are material to the disposition of Defendants' motion for summary judgment. They are drawn from the parties' factual briefing, (Docket #48–#50, #52–#58, #66–#68, #72–#73, #75), unless otherwise noted. The Court will discuss the parties' principal factual disputes as appropriate.

**3.1      The Parties**

Nigl has been a prisoner within the Wisconsin Department of Corrections ("Corrections") since 2001. He is serving a 100-year bifurcated sentence for two counts of intoxicated homicide by use of a vehicle. From the time he was first incarcerated until September 2015, he was housed at Waupun Correctional Institution ("Waupun"). Between September 2015 and June 2018, he was housed at Redgranite Correctional Institution

("Redgranite"). It was during his incarceration at Redgranite that Johnston, his fiancée, sought to be placed on his visitor list and the couple requested permission to be married. Since June 2018, he has been housed at Fox Lake Correctional Institution.

Johnston is a former Corrections employee. From April 2013 until January 2015, Johnston worked as a psychologist at Waupun, where she met Nigl. She provided psychological services to Nigl and had numerous clinical contacts with him while working at Waupun.[1] On January 10, 2015, Johnston left her job at Waupun and began to work at the Wisconsin Resource Center, which is not a Corrections facility. Her hiatus from employment with Corrections lasted about six months. On or around July 13, 2015, Johnston returned to employment with Corrections, this time as a psychologist in Corrections' central office in Madison. Her position in the central office was terminated in October 2015, for reasons explained below.

Defendant Michael Meisner ("Meisner") has been the warden of Redgranite since March 2014. Meisner was the final decisionmaker who denied Johnston's requests to be placed on Nigl's approved visitor list at Redgranite and denied Nigl and Johnston's request to marry.

Defendant Sara Hungerford ("Hungerford") is a licensed social worker. She worked for Corrections from 2009 through 2017, when she retired from state service. She was a social worker at Redgranite from April

---

[1]Plaintiffs attempt to dispute that Nigl was, in a technical sense, Johnston's patient, noting that "it is not unusual for inmates to drop into see a psychology staff member whether or not they were on a professional mental health caseload." (Docket #66 at 2; #67 at 7–8). But Plaintiffs do not actually dispute that Nigl saw Johnston for professional services, and Defendants cite sufficient evidence to show this to be true. *See, e.g.,* (Docket #52-7 at 2–3; #54-2 at 21; #54-5 at 18, 21). This fact is not, therefore, genuinely disputed.

2015 through June 2017. She reviewed and ultimately recommended denial of Johnston's requests to be placed on Nigl's approved visitor list and Nigl and Johnston's request to marry.

Defendant Zachary Schroeder has been a unit manager at Redgranite since February 2016. He was Hungerford's supervisor and he conferred with her in the decision to recommend denial of Johnston's requests to be placed on Nigl's approved visitor list and Nigl and Johnston's request to marry.

Finally, Defendant Jon Litscher served as the secretary of Corrections from March 2016 until his retirement in June 2018.

### 3.2 Nigl and Johnston's Relationship

On January 12, 2015, days after Johnston left her employment at Waupun, Nigl asked his brother to seek out Johnston's contact information. Nigl began communicating with Johnston by letter, and then also by phone and email, on a regular basis. In April 2015, Nigl asked Johnston to marry him and she said yes.

As noted above, Johnston returned to employment with Corrections in July 2015. On her first day of work at the central office in Madison, she submitted a "fraternization policy exception request" to her supervisor, Gary Ankarlo ("Ankarlo"), requesting permission to have contact with Nigl. On the form, under the section titled, "Nature of Employee Relationship to Offender," Johnston checked the box marked "other" and wrote, "Met at WCI approximately 04/13. Relationship → professional." (Docket #55-1 at 1). Johnston did not disclose that she was engaged in a romantic relationship with Nigl. Ankarlo refused to process the fraternization request as he was supposed to, for reasons not entirely clear

from the record, and he returned the form to Johnston. Nigl and Johnston continued to have contact anyway.

In September 2015, Corrections learned from an anonymous survey submission that Johnston had a relationship with an inmate. Johnston was placed on administrative leave and then, on October 29, 2015, her position was terminated "due to allegations that have been made against you pertaining to violation of the Department's fraternization policy." (Docket #55-3 at 2).

Two investigations ensued. First, Corrections undertook an investigation to determine whether Johnston had violated department rules—such as Executive Directive #16, which prohibits staff from having unapproved relationships with offenders—and whether she had violated the Prison Rape Elimination Act by engaging in a relationship with a patient inmate (the "Employee/PREA Investigation").

After this investigation commenced, Meisner, the warden of Redgranite, contacted the Wisconsin Department of Safety and Professional Services ("DSPS") to complain to the Wisconsin Psychology Examining Board about Johnston's alleged relationship with Nigl. Meisner testifies by declaration that he felt he had a duty to report what he believed was a significant professional ethical violation. DSPS undertook its own investigation (the "DSPS Investigation").

### 3.3 The Employee/PREA Investigation

The Employee/PREA investigation began in early November 2015 at Redgranite, as that was where Nigl was housed at the time. During the investigation, Redgranite staff searched Nigl's cell and found numerous cards, letters, and photographs from Johnston. Some of the photos depicted Johnston in various stages of undress and in sexually provocative poses.

Johnston sent some of these items under the alias "Cassie Fox" or "Cass." She had also set up an account with the prison's phone system under the name Cassie Fox.

Meisner testifies that because of Johnston's status as a current employee of Corrections, these items were considered contraband. He also says that he concluded Johnston's use of an alias was done with the intent of concealing her identity as a former Corrections employee and demonstrated her willingness and ability to thwart security protocol of the institution. The Plaintiffs insist that Johnston sent these items during the period when she was not employed by Corrections. *See* (Docket #73 at 13).

On or around December 7, 2015, the Employee/PREA Investigation concluded. The allegation that Johnston was in a relationship with Nigl was determined to be substantiated. The question of whether Johnston had violated the PREA was not substantiated, based on inconclusive evidence as to whether the couples' intimate relationship began while Johnston was employed at Waupun.

### 3.4 The DSPS Investigation

The DSPS conducted its own investigation, which culminated in an order from the Psychology Examining Board dated August 25, 2016. (Docket #52-7 at 2–10). That order begins with findings of fact learned in the investigation. *Id.* at 1. According to the order, Johnston admitted to a DSPS investigator that Nigl had kissed her on her last day at Waupun, but she did not report it. *Id.* at 4. She also admitted that she had at least one sexual fantasy about Nigl before leaving Waupun. *Id.* Johnston and Nigl now testify that they did not kiss on that day; they only hugged. (Docket #68 at 1). DSPS found that Johnston engaged in unprofessional conduct and was

subject to discipline under state law. *Id.* at 4–5. Her license was suspended for one year. *Id.* at 5.

### 3.5    Requests for Visitation and Marriage

In November 2015, Johnston submitted an application to be placed on Nigl's approved visitors' list. On December 2, 2015, Joli Grenier, a social worker, recommended denial of the visitor application because Wis. Admin. Code § DOC 309.08(4)(j) prohibits visits for people who were employed by Corrections within the previous 12 months. Johnston, of course, had been employed by Corrections in the previous 12 months. Johnston wrote to Meisner about her visitation request, and Meisner told her that the denial was appropriate, but she could resubmit an application after six months.

A year later, in November 2016, Johnston submitted a second application to be placed on Nigl's approved visitors' list. On November 30, 2016, Hungerford, then a social worker at Redgranite, recommended denial of the second application on the grounds that:

> The warden has reasonable grounds to believe that you, the proposed visitor, have attempted to bring contraband into any penal facility, or that you otherwise pose a threat to the safety and security of visitors, staff, offenders or the facility[;]
>
> The warden has reasonable grounds to believe that the offender's reintegration into the community or rehabilitation would be hindered[; and]
>
> The warden has reasonable grounds to believe that the offender's offense history indicates there may be a problem with the proposed visitation[.]

(Docket #52-6 at 5). Schroeder, Hungerford's supervisor, adopted Hungerford's recommendation.

On December 7, 2016, Nigl, believing Corrections' denial of visitation to be unreasonable, submitted an inmate grievance. The inmate complaint examiner ("ICE") recommended dismissal of the grievance because denial of visitation and marriage was "reasonable given the fact the proposed visitor has shown disregard for [Corrections] policy when she was employed by [Corrections]. The propensity for the same/similar behavior to reoccur could pose a threat to the safety and security of visitors, staff, offenders and the facility." *Id.* at 3–4. Nigl appealed, and his appeals were denied.

Sometime in early December 2016, Johnston and Nigl submitted a request for marriage. They included confirmation of an officiant who had agreed to officiate the wedding. Pursuant to Division of Adult Institutions Policy and Procedure #309.00.06, an inmate may request to marry while incarcerated if the following conditions are met:

A. The marriage does not pose a threat to the security of the institution/center or a threat to the safety of the public;

B. There are no legal impediments to the marriage;

C. The inmate is not scheduled for release within nine months;

D. The proposed spouse or the proposed spouse's children are not victims of the inmate;

E. The proposed spouse has never been convicted in any criminal activity with the inmate; and

F. The proposed spouse has been on the inmate's visiting list for a minimum of one year, or is able to demonstrate a longstanding relationship with the proposed spouse.

(Docket #52-9 at 1–2). The decision to approve or deny a marriage request is ultimately a matter within the warden's discretion.[2] Hungerford received the marriage request and she reviewed it first, in consultation with Schroeder. On January 25, 2017, Hungerford recommended that the warden deny the request because

> there are reasonable grounds to believe the marriage poses a threat to the security of the facility or a threat to the safety of the public, or threatens other legitimate penological interests . . . [and the] proposed spouse has not been on the visiting list for at least one year and is not able to demonstrate a longstanding relationship.

(Docket #52-8 at 4–5) (internal punctuation omitted). Schroeder and Meisner agreed with Hungerford's recommendation. Meisner states this his decision was based on Johnston having violated the code of professional conduct as a psychologist, as evidenced by the DSPS final order; Johnston having violated department work rules; Meisner's belief that Nigl is the victim of Johnston, a former Corrections employee; Meisner's belief that the marriage would pose a threat to the security of the facility and would threaten other legitimate penological interests; and the lack of longstanding relationship. He believes their relationship was established on lies, deception, and rule breaking. *See* (Docket #52).

On January 26 and February 11, 2017, Nigl submitted inmate grievances about the marriage denial. The ICE recommended denial of the

---

[2] As this Court has previously noted, there is no section of DAI 309.00.06 specifically dedicated to providing the warden guidance on his/her decision to grant or deny a marriage request, seemingly leaving the warden with unfettered discretion. *See Reed v. Kemper*, No. 15-CV-208-JPS, 2015 WL 9239813, at *3 (E.D. Wis. Dec. 17, 2015), *aff'd in part, vacated in part, remanded,* 673 F. App'x 533 (7th Cir. 2016). In other words, the policy does not mandate which—if any—factors the warden must consider in evaluating an inmate's marriage request. *Id.*

grievances, finding that staff had acted in accordance with relevant policy in prohibiting the marriage. Nigl appealed, and his appeals were denied.

**4.     ANALYSIS**

Plaintiffs and Defendants each claim that the undisputed facts show they are entitled to summary judgment. Plaintiffs seek an injunction ordering Defendants to approve their request to marry and an award of compensatory and punitive damages. Defendants deny liability and claim that they are immune from a suit for damages under the doctrine of qualified immunity. As described more fully below, the Court finds that Defendants are entitled to summary judgment as a matter of law on each of Plaintiffs' claims.

**4.1     Right to Marry**

The Constitution protects a prisoner's fundamental right to marry; he does not lose that constitutional protection simply because he is imprisoned. *Riker v. Lemmon*, 798 F.3d 546, 551 (7th Cir. 2015) (citing *Turner v. Safley*, 482 U.S. 78, 94–96 (1987)); *see also Obergefell v. Hodges,* 135 S. Ct. 2584, 2598 (2015) (recognizing that "[o]ver time and in other contexts, the Court has reiterated that the right to marry is fundamental under the Due Process Clause"). That protection, however, "is subject to substantial restrictions as a result of incarceration." *Turner*, 482 U.S. at 95. A prison regulation that impinges on an inmate's right to marry is permitted so long as it is "reasonably related to legitimate penological interests." *Id.* at 89.

Courts consider four factors to determine the reasonableness of a prison regulation that restricts the right to marry:

> (1) whether a valid, rational connection exists between the regulation and a legitimate government interest behind the rule; (2) whether there are alternative means of exercising the right in question; (3) what impact accommodation of the

asserted constitutional right would have on guards, other inmates, and on the allocation of prison resources; and (4) what easy alternatives exist to the regulation because, although the regulation need not satisfy a least restrictive alternatives test, the existence of obvious alternatives may be evidence that the regulation is not reasonable.

*Riker*, 798 F.3d at 552 (citation omitted).[3] These factors tend to blend together and are not meant to be weighed according to any precise formula. *Aiello v. Litscher*, 104 F. Supp. 2d 1068, 1075 (W.D. Wis. 2000). Although all four factors are important, the first can act as a "threshold factor" regardless which way it cuts. *Riker*, 798 F.3d at 553 (quoting *Singer v. Raemisch,* 593 F.3d 529, 534 (7th Cir. 2010)); *see also Mays v. Springborn*, 575 F.3d 643, 648 (7th Cir. 2009) ("Where there is only minimal evidence suggesting that the prison's regulation is irrational, running through each factor at length is unnecessary.").

In applying this test, "a regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." *Riker*, 798 F.3d at 553 (internal citations omitted) (finding that a prison's unsubstantiated concerns regarding institutional safety precluded summary judgment for the defendants in a case where a former prison employee challenged the facility's decision to prohibit her marriage to an inmate).

"Although the burden of persuasion is on the prisoner to disprove the validity of a regulation, prison officials must still articulate their

---

[3]The standard is the same for Nigl and Johnston, even though Nigl is incarcerated and Johnston is not. *Keeney v. Heath,* 57 F.3d 579, 581 (7th Cir. 1995) ("[S]o far as challenges to prison regulations as infringing constitutional rights are concerned, the standard is the same whether the rights of prisoners or of nonprisoners are at stake.") (citation omitted).

legitimate governmental interest in the regulation and provide some evidence supporting their concern." *Id.* (internal citations omitted). Nonetheless, courts "must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Id.* (citation omitted).

Because the first *Turner* factor can be a "threshold" inquiry, and because Defendants do not argue that any other *Turner* factor supports their decision to prohibit Nigl and Johnston from marrying, *see* (Docket #59 at 11–15), the Court's analysis will focus on the first factor.[4] It asks whether the Defendants have presented a valid, rational connection between the marriage prohibition and a legitimate penological interest. The Defendants have provided several reasons to justify their decision to prohibit the marriage.

First, Defendants say the marriage poses a threat to the institution because of Johnston's demonstrated willingness to break the rules—both Corrections' rules and the ethical rules of her profession. (Docket #59 at 12). As to the latter, the Defendants point to the DSPS order finding that she had

_____

[4]Nor could Defendants reasonably justify the marriage denial with reference to the other factors. As to the second factor, there are no alternative means for Nigl and Johnston to marry the person of their choosing besides marrying each other; the right to marry includes the right to select one's spouse. *See Obergefell,* 135 S.Ct. at 2599; *see also Riker,* 798 F.3d at 555 (dismissing defendants' argument that because a former prison employee was free to marry anyone but an inmate, the prohibition imposed a minimal burden). As to the third and fourth factors, Defendants have not put forward evidence that arranging and monitoring a one-time meeting for a brief ceremony would strain prison resources. *See Riker,* 798 F.3d at 557 ("It is implausible to suggest, without some supporting evidence, that a brief marriage ceremony cannot be accommodated without threatening institutional security and without imposing more than a *de minimis* impact on prison resources.").

committed professional misconduct by engaging in "seductive, romantic, or exploitive" conduct with a patient and suspending her license. *Id.* As to her violation of Corrections' rules, Defendants cite many instances of misconduct[5]: Johnston and Nigl kissing on Johnston's last day at Waupun (though Plaintiffs now deny that happened), Johnston sending Nigl mail using an alias in order to deceive the prison (though Plaintiffs deny a deceptive intent), Johnston misrepresenting her relationship with Nigl as "professional" on the fraternization request form she submitted upon her re-employment with Corrections, and Johnston ignoring Corrections policy by continuing to have contact with Nigl even though her fraternization request had not been approved. *Id.* at 14–15. The Defendants argue that allowing these rulebreakers to marry would "threaten[] prison security and undermine[] inmate rehabilitation." *Id.* at 15.

Second, Meisner believes that Johnston, in her position as a professional psychologist and Corrections employee, has victimized Nigl. *Id.* at 13. This, Meisner says, establishes "reasonable grounds to believe the marriage poses a threat to the security of the facility and threatens other legitimate penological interests." *Id.* at 13.

Finally, Defendants argue the marriage denial was appropriate because Johnston and Nigl have not demonstrated a longstanding relationship. This is premised in part on Johnston not being an approved visitor for Nigl (though it was Defendants' decision to keep her off his visitor list, based on a violation of the fraternization rule), *id.* at 12, and

---

[5]Some of these instances of misconduct are premised on disputed facts, as explained parenthetically in text. Those disputes do not preclude summary judgment because, even apart from those instances of misconduct that Plaintiffs dispute, Defendants had other legitimate reasons to prohibit the marriage.

Meisner's belief that Johnston and Nigl "have demonstrated a relationship that was established on lies, deception, and rule breaking." (Docket #52 at 15). On this point, Plaintiffs aver that they have been "dating" since January 2015, have spoken on the phone or by email daily since then, became "betrothed" by entering into a "Covenant of Love" in November 2015, and love each other and desire to enter into the sacred covenant of marriage. (Docket #49 at 1–2).

The Court finds that Defendants' decision to deny Plaintiffs' request to marry was reasonably related to a legitimate penological interest. Corrections and the Defendants in this case are tasked with protecting the safety and security of inmates, staff, and the public who enter Corrections' institutions. Corrections has strict rules against fraternization between inmates and staff in order to ensure that security. As part of their charge, wardens must carefully monitor staff and inmate relationships to ensure that the institution's rules are obeyed and its security is not breached.

In this case, Plaintiffs have demonstrated a willingness to bend Corrections' rules in furtherance of their relationship. Developing a personal relationship while Johnston was employed at Waupun, communicating under an alias, misrepresenting the nature of their relationship on Johnston's fraternization request, and continuing their relationship, without approval, when Johnston was employed at the central office collectively demonstrate that Plaintiffs do not have respect for the integrity of Correction's rules and its process for approving inmate-staff relationships. These considerations are relevant to the orderly management of the institution. Defendants' decision to forbid Plaintiffs' marriage, then, is reasonably related to their goal of ensuring a secure prison where staff and inmates respect the rules.

**4.2     Equal Protection**

Next, Plaintiffs allege a class-of-one equal protection claim under the Fourteenth Amendment based on Defendants' refusal to allow visitation for them but not for other couples they say are similarly situated to them. In a class-of-one equal protection case, the plaintiff must prove that he was "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 601 (2008). The Seventh Circuit has implied that it is possible for an inmate, or his would-be visitor, to state a class-of-one equal protection claim based on denial of visitation if the plaintiff alleges that the prison allows visits between similarly-situated inmates and visitors. *Bilka v. Farrey*, 447 F. App'x 742, 744 (7th Cir. 2011).

### 4.2.1   No Similarly-Situated Comparators

Plaintiffs point to two cases involving visitation requests by former Corrections employees as evidence that they are being treated differently than similarly-situated people with no rational basis: *Bilka* and *State of Wisconsin ex rel. David W. Bentley v. Edward Wall, et al.*, Dane County Case No. 15-CV-333 (Wis. Cir. Ct. 2015). However, the litigants in those cases are not sufficiently comparable to Plaintiffs.[6]

The plaintiff in *Bilka* was Susan Bilka ("Bilka"), a former Corrections employee who had befriended an inmate, Mackenzie Burse ("Burse"),

---

[6]Before filing their summary judgment motion, Plaintiffs filed a motion to compel the Defendants to produce prison visitation logs related to Burse and Bentley. (Docket #41). Because the Plaintiffs have provided other evidence to prove the fact for which they wanted these records—that Burse and Bentley are now permitted visits with women with whom they started relationships while the women were Corrections employees—the visitation logs are not necessary. The other evidence they sought in the motion is not relevant. The motion will be denied.

while working in food services for the New Lisbon Correctional Institution. *Id.* at 743. She began smuggling him contraband, including cocaine, marijuana, and alcohol. *Id.* The prison discovered Bilka's misconduct, and she resigned from her position and pleaded guilty to delivering illegal articles to an inmate. *Id.* Once Bilka's sentence ended, she asked the prison to place her on Burse's visitor list. *Id.* The prison denied her request and explained that she posed a threat to the safety and security of the facility. *Id.* Bilka continued to apply for visitation with Burse for two years but the prison would not permit it. *Id.*

Bilka brought a class-of-one equal protection claim and the district court dismissed it for failure to state a claim. The Seventh Circuit affirmed, stating that even if Bilka believed that prison administrators were acting out of spite, she did not allege "that the prison allows other state offenders who have secreted contraband to inmates to continue to visit those inmates. Absent such an assertion, she has no class-of-one claim for an equal protection violation." *Id.* at 744.

Plaintiffs state that, sometime after the Seventh Circuit's order, Corrections began permitting visits between Bilka and Burse. To support this fact, Plaintiffs provide a declaration from Edward Jackson ("Jackson"), an inmate who was housed at Green Bay Correctional Institution in 2012 and 2013 along with Burse. (Docket #47-2 at 84–85). Jackson confirms that while Bilka was originally prohibited from visiting Burse, she was later placed on Burse's approved visitors' list. *Id.* Between January 2012 and September 2013, Jackson says that he was often in the visiting room together with Burse and Bilka. *Id.*

In *Bentley, Jr.*, the other case on which Plaintiffs rely, David W. Bentley, Jr. ("Bentley") was an inmate at Waupun who complained about

the prison's refusal to place Kristina Rickman ("Rickman") on his visitors list. *See* (Docket #47-2 at 71–78). Rickman and Bentley became romantically involved while Rickman was a Corrections employee. She left Corrections when the relationship was discovered and ultimately pleaded guilty to misconduct in public office. In October 2015, the Dane County Circuit Court affirmed the prison's decision to forbid visitation between Bentley and Rickman. *Id.* Plaintiffs provide evidence in the form of a Corrections memorandum that in March 2016, Rickman was placed on Bentley's visitors list for no-contact visits at the Wisconsin Secure Program Facility. (Docket #67 at 9). Defendants do not dispute this. (Docket #72 at 2).

The circumstances surrounding Defendants' decision to prohibit Johnston and Nigl from visiting are not similar to those in *Bilka* or *Bentley* in several material respects. First, and most obviously, *Bilka* and *Bentley* involve different prison officials at different institutions. The wardens at those institutions have made judgments, in their discretion, about the propriety of visitation in their prisons between certain former Corrections employees and inmates; but that is not relevant to whether the Defendants in this case have treated Johnston and Nigl different from other similarly situation people.

Next, Johnston's final visitation request was denied less than two years after she was terminated from Corrections for fraternization violations. By contrast, several years had passed after Bilka's and Rickman's fraternization with inmates before they were permitted to visit those

inmates.[7] As the Defendants note, the passage of time is a relevant factor in the warden's determination of whether visitation is appropriate.

Finally, Johnston is a psychologist who violated the ethical rules of her profession by fraternizing with Nigl. Based in part on her professional position relative to Nigl, Meisner believes that Johnston victimized Nigl and continues to pose a threat to Nigl. There is no evidence that Bilka or Rickman had similar positions relative to the inmates with whom they formed relationships.

### 4.2.2.  Defendants' Rational Basis to Deny Visitation

In addition to a lack of comparators, Plaintiffs' equal protection claim fails because the Defendants' denial of visitation was a rational exercise of discretion.[8] The Defendants believed that Johnston posed a threat to institution security because she had demonstrated her willingness to break the institution's rules. They also believed Johnston's visits would compromise Nigl's rehabilitation because the pair would have essentially been rewarded despite breaking fraternization rules. Therefore, the

---

[7]Bilka's misconduct was committed in 2004 and she was allowed to visit Burse in 2012. *Bilka v. Farrey*, No. 11-C-0430, 2011 WL 2444045, at *1 (E.D. Wis. June 15, 2011), *aff'd*, 447 F. App'x 742 (7th Cir. 2011). The criminal complaint charging Rickman with misconduct in office was filed in January 2012 and she was permitted to visit Bentley in 2016. *See Wisconsin v. Rickman,* Brown County Case No. 2012CF333, available by searching the Wisconsin Circuit Court Access website at *wcca.wicourts.gov.*

[8]Class-of-one equal protection claims are very difficult, if not impossible, to prove in the context of an official's discretionary decision-making. *See Atkinson v. Mackinnon*, No. 14-CV-736-BBC, 2015 WL 506193, at *1 (W.D. Wis. Feb. 6, 2015) (prison disciplinary decisions not subject to equal protection challenge) (citing *Engquist v. Or. Dep't of Agric.,* 553 U.S. 591, 603–04 (2008) (class-of-one equal protection claims not available for discretionary decisions "based on a vast array of subjective, individualized assessments.").

Defendants' decision to deny visitation was not arbitrary; their exercise of discretion was based on legitimate reasons.

**5.   CONCLUSION**

On the undisputed facts in the record, summary judgment is appropriate in favor of the Defendants on both of Plaintiffs' claims.[9] The Court must, therefore, grant the Defendants' motion, deny Plaintiffs' motion as moot, and dismiss this action with prejudice.[10]

Accordingly,

**IT IS ORDERED** that the Defendants' motion for summary judgment (Docket #51) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that the Plaintiffs' motion for summary judgment (Docket #46) be and the same is hereby **DENIED as moot**;

**IT IS FURTHER ORDERED** that the Plaintiffs' motion to compel (Docket #41) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that the Plaintiffs' motion for appointment of counsel (Docket #77) be and the same is hereby **DENIED**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED with prejudice**.

The Clerk of the Court is directed to enter judgment accordingly.

---

[9]Because the Court finds summary judgment in favor of the Defendants is appropriate on the merits, the Court does not reach the Defendants' request for application of the doctrine of qualified immunity. *See* (Docket #59 at 23–25).

[10]In light of this dismissal, the Court will also deny Plaintiffs' motion to appoint counsel to assist them at trial. (Docket #77).

Dated at Milwaukee, Wisconsin, this 29th day of March, 2019.

BY THE COURT:

J. P. Stadtmueller
U.S. District Judge